(C.D. 4500)

John V. Carr & Son, Inc. v. United States

Court No. 72–7–01636

(Decided February 19, 1974)

*Barnes, Richardson & Colburn* (*Joseph Schwartz and Irving Levine* of counsel) for the plaintiff.

*Irving Jaffe*, Acting Assistant Attorney General (*Joseph I. Liebman*, trial attorney), for the defendant.

MALETZ, Judge: This action involves the proper tariff classification of articles imported in 1972 from Canada via the port of Detroit that were described on the special customs invoice as cold formed side rails, and on the consumption entry as parts for railway cars.

The goods were manufactured by Canadian Metal Rolling Mills, Ltd., Mississauga, Ontario (hereafter referred to as "Canadian Mills") and imported by ACF Industries, AMCAR Division, Huntington, West Virginia (hereafter referred to as "Amcar"). The plaintiff, John V. Carr & Son, Inc., is a customs broker, agent and attorney in fact for the importer.

The imported articles were assessed by the government under item 690.35 of the Tariff Schedules of the United States, as parts of railroad or railway cars, at 9% ad valorem. Plaintiff contends that the proper classification should be under item 609.80 as steel angles, shapes, or sections, cold formed, weighing over 0.29 pound per linear foot, not drilled, punched or otherwise advanced, and of other than alloy steel, at the rate of 0.1 cent per pound.

The pertinent provisions of the tariff schedules read as follows:

Assessed Under:

Schedule 6, part 6.

690.15      Railroad and railway rolling stock:
Passenger, baggage, mail, freight
and other cars, not self-propelled_        \* \* \*
      \*     \*     \*     \*     \*     \*     \*

Parts of the foregoing articles:

\* \* \* \* \* \* \*

Other:

690.35      Parts of cars provided for in item 690.15, except brake regulators_    9% ad val.

Claimed Under:

Schedule 6, part 2, headnote 1.

\* \* \* This part does not include—

\* \* \* \* \* \* \*

(iv) other articles specially provided for elsewhere in the tariff schedules, or parts of articles.

Schedule 6, part 2, subpart B, headnote 1.

This subpart covers iron and steel, their alloys, and their so-called basic shapes and forms, and in addition covers iron or steel waste and scrap.

Schedule 6, part 2, subpart B, headnote 3.

Forms and condition of iron or steel.—For the purposes of this subpart, the following terms have the meanings hereby assigned to them:

\* \* \* \* \* \* \*

(j) Angles, shapes, and sections: Products which do not conform completely to the respective specifications set forth herein for blooms, billets, slabs, sheet bars, bars, wire rods, plates, sheets, strip, wire, rails, joint bars, or tie plates, and do not include any tubular products.

\* \* \* \* \* \* \*

Schedule 6, part 2, subpart B.

Angles, shapes, and sections, all the foregoing, of iron or steel, hot rolled, forged, extruded, or drawn, or cold formed or cold finished, whether or not drilled, punched, or otherwise advanced; sheet piling of iron or steel:

     Angles, shapes, and sections:

         Hot rolled; or, cold formed and weighing over 0.29 pound per linear foot:

             Not drilled, not punched, and not otherwise advanced:

609.80                 Other than alloy iron or steel _____    0.1¢ per lb.

I

We consider first the facts developed in the record.[1] The importer, Amcar, is in the business of building railroad cars and equipment and in this connection uses the imported side rail—which measures some 53 feet in length—as a structural stress carrying member of a railroad hopper car.

The importations—which are manufactured by Canadian Mills in accordance with Amcar's specifications and are not a stock item—are produced from a coil of steel which is fed into a set of three pinch rolls to eliminate the curvature. After this, the sheet metal is fed into a set of guides called a "mill entry." From there, the sheet goes into a continuous production cold roll forming machine—consisting of 15 forming passes—which gradually forms the steel sheet into its final shape. It is then cut off at the end of the line and bundled with other side rails for shipment.

Upon completion of this production process, the side rail is angular in shape; has two curves which are called stiffening ribs; and has flanges on either end to enable the rail to fit flush with the curvature of the railroad hopper car.

When the imported side rail is received by Amcar, the first operation it performs is to weld intermediate gussets to its inside in order to stiffen it.[2] At this point, the imported rail is then transferred to a side blanket assembly line. This blanket assembly is composed of a series of steel sheets, butt welded together, which eventually form the side of the hopper car. The imported rail is welded directly to the top of the blanket assembly. In addition, various appurtenances are tack welded to other parts of the assembly. Parenthetically, it is to be noted that when Amcar starts building the blanket assembly, it does not know what the exact length of the assembly will be and hence it orders from Canadian Mills rail having the maximum length that it believes will be required. Sometimes, however, the length of the rail so ordered is between a half-inch or inch longer than the blanket assembly, in which case Amcar trims the excess off the edge. On the other hand, if the rail is less than a half-inch longer, the excess is regarded as insignificant and is not trimmed off.

---

[1] The record consists of the testimony of two witnesses called by plaintiff, the first, John L. Goldie, the vice president and general manager of Canadian Mills, the second, John H. Snyder, the director of purchasing and traffic of Amcar. Both witnesses had academic training in engineering and commercial experience in the steel business. In addition, plaintiff introduced in evidence (1) a number of photographs which showed the imported articles, illustrated their process of manufacture, and showed their use in the manufacture of railroad hopper cars; and (2) a schematic drawing of the hopper car. Defendant did not call any witnesses or present any exhibits.

[2] A gusset is an angular piece of iron used to strengthen angles. See e.g., Webster's *New International Dictionary* (2d. ed., 1958).

Finally, the side blanket assembly, incorporating the imported rail, is welded to the intermediate and end bulkheads of the car and forms the side of the car.

The record further demonstrates that at the time of importation and immediately prior thereto, the imported merchandise was used only for incorporation into railroad stock of the kind described in item 690.15 of the tariff schedules. Also, it is established that the thickness of the imported rails does not vary along the lengths; that they are cold formed items which weigh over 0.29 pound per linear foot; and that they are not drilled, punched or otherwise advanced beyond the cold formed shape. Additionally, it is undisputed that the imported rails are not blooms, billets, slabs, sheet bars, bars, wire rods, plates, sheets, strip, wire, rails, joint bars, tie plates or tubular products, as defined in schedule 6, part 2, subpart B, headnote 3(j).

In the opinion of the witness Goldie, vice president and general manager of the manufacturer, Canadian Mills, the imported articles are basic steel angular shapes which are symmetrical through their cross section and are rolled as a continuous process. Further, in his opinion, all steel angles, shapes and sections are ordinarily incorporated into other articles; there are very few that are complete for use as they are; and angles, shapes and sections which are drilled, punched or otherwise advanced, are dedicated to use as parts of articles.

The imported rails were identified in the "PARTS LIST" of Amcar's schematic drawing of the hopper car as part No. 92 (side plate). In addition, plaintiff's witness Snyder, the director of purchasing for Amcar, described the imported rail as "an integral part of the car." He further testified that no bending or shaping was performed on the imported merchandise and that that part was merely assembled to the blanket assembly. According to Snyder, the imported articles are not similar to axles or wheels or brake regulators for railway cars since the latter items are classified in the railway car industry as "specialty" parts which are changeable from one car to another. Such specialty parts, he stated, do not become an integral part of the car, as does a structural member such as the imported rail. Continuing, he stated that specialty parts are severable in that they can be removed from the car without damaging it; on the other hand, the imported rail and other integral parts of the car can be removed only by burning them off, thus doing some damage to the car itself.[3]

---

[3] As pointed out above, the imported rails were identified in Amcar's schematic drawing of the hopper car as parts. Further, Snyder repeatedly testified that the imported rail was an integral part or part of the car. See e.g., tr. pp. 35, 37, 45. In these circumstances, little credence can be given to Snyder's later assertion (tr. p. 59) that only "specialty parts" were considered to be "parts," while "parts for the items that make-up the integral car body itself [including the imported rails]" were *"consider[ed] to be raw material."* [Emphasis added.]

## II

Against this background, the question is whether or not the imported rails are "parts of articles" within the meaning of the exclusionary headnote 1(iv) of part 2 of schedule 6.[4] As to this, plaintiff argues (1) that the imported articles are not "parts of articles" within the meaning of the headnote but rather are materials—this on the asserted basis that further processing of the importations is required after importation; (2) that to hold that the importations are parts of articles would render the provision for steel angles, shapes and sections wholly or substantially nugatory; and (3) that the imported articles are steel angles, shapes or sections of the kind intended to be classified under item 609.80. Defendant, on the other hand, contends that since the imported merchandise is specially provided for under item 690.35 as parts of railroad cars, and since headnote 1(iv) of part 2 of schedule 6 precludes the classification under that part of articles specially provided for elsewhere and parts of articles, the imported merchandise, even if it is a basic shape within the ambit of item 609.80, remains classifiable under item 690.35. For the reasons that follow, the court agrees with defendant's position and holds that the imported articles were properly classified by the government under item 690.35 as parts of railroad cars.

## III

Directly relevant to the problem here is this court's decision in *The Servco Company* v. *United States*, 68 Cust. Ct. 83, C.D. 4341 (1972), aff'd, 60 CCPA 137, C.A.D. 1098, 477 F. 2d 479 (1973). As this court pointed out (68 Cust. Ct. at 88):

> * * * [P]art 2, subpart B is intended to classify so-called basic shapes and forms of iron or steel, * * *. Schedule 6, part 2, headnote 1(iv), * * * which states that it does not include in any of its subparts, * * * other articles specially provided for elsewhere in the tariff schedules, or parts of articles, is obviously intended to exclude basic shapes and forms of metal, * * * that are specially provided for elsewhere in the tariff schedules. *The headnote, in our opinion, also excludes identifiable parts of an article solely or chiefly used as a part of an article provided for, with its parts, in a superior heading of the tariff schedules.* * * * [Emphasis added.]

*Servco*, it is to be noted, involved so-called drill collars in the shape and form of pipes and tubes of steel that were imported in 30 foot lengths and were solely used with earth boring machinery to weight the drilling bit. After importation, the drill collar was processed for

---

[4] This headnote, which has been previously quoted, provides that part 2 of schedule 6 does not include "other articles specially provided for elsewhere in the tariff schedules, or *parts of articles.*" [Emphasis added.]

that use by welding an alloy steel "sub" to one end of the article, or by cutting threads in one end. It was then attached immediately above the drilling bit. The merchandise was classified by the government as pipes and tubes of steel under item 610.52 which, like item 609.80, the claimed provision in the present case, comes within schedule 6, part 2, subpart B of the tariff schedules. The court held that since the imported articles—though unfinished—had no other use but to be finished into drill collars, and since drill collars were used solely as parts of boring machinery, they were, by virtue of headnote 1(iv), excluded from classification as pipes and tubes of steel and properly classifiable as parts of boring machinery under item 664.05, as claimed by plaintiff.

The considerations deemed controlling in *Servco* are equally applicable here. Thus, in the present case, the rails in question had been advanced in their manufacture to such a point that after importation no further processing was required save for welding intermediate gussets to their inside to stiffen them and for occasionally trimming between a half-inch or inch of excess metal from the edge.[5] In short, in their imported condition, the involved rails were virtually ready for use only as a part of the railroad stock described in item 690.15 requiring as they did merely insubstantial further processing. Put otherwise, the imported rails had been so far processed toward their completed form as a part of a railroad car as to be dedicated to the making of that article alone. As stated in *Steinway & Sons* v. *United States*, 23 Cust. Ct. 30, 33, C.D. 1185 (1949) : "Where a material has been so advanced in manufacture as to have reached a stage in which it is clearly incapable of being made into more than one article, then it shall be deemed, even though unfinished, to have been so dedicated to a single use as to fix its status as a part of that article." Hence, even though the present merchandise in its imported condition was unfinished, it still is classifiable as a part of a railroad car—a conclusion that is emphasized by general interpretative rule 10(h) which provides that "unless the context requires otherwise, a tariff description for an article covers such article * * * whether finished or not finished * * *." See e.g., *United States* v. *The Servco Company, supra,* 60 CCPA at 137, 477 F. 2d at footnote p. 582. See also e.g., *American Import Co.* v. *United States,* 26 CCPA 72, 74, T.D. 49612 (1938).

Added to this, plaintiff has conceded that at the time of importation and immediately prior thereto, the imported merchandise was used only for incorporation into railroad cars. Also, it is to be noted that in its imported condition, the rail in issue (as previously observed) is

---

[5] Not only is trimming of this kind *de minimis,* it does not affect classification of the article. See e.g., *F. W. Myers & Co., Inc.* v. *United States,* 69 Cust. Ct. 30, C.D. 4370, 345 F. Supp. 1006 (1972) ; *American Mannex Corp.* v. *United States,* 56 Cust. Ct. 31, 37, C.D. 2608 (1966).

identified in Amcar's schematic drawing of a hopper car as a part; that it bears a part number; and that plaintiff's witness Snyder described it as an "integral part of the car." In sum, from what has been said, the conclusion is inescapable that the imported rail is a part and not a mere material. Indeed, in the circumstances of a case such as this, in order to constitute a mere material, substantial further processing or manufacturing would be necessary after importation before the merchandise became a completed product or a completed part of a product. See e.g., *Associated Metals & Minerals Corp.* v. *United States*, 65 Cust. Ct. 586, C.D. 4143, 320 F. Supp. 997 (1970).

Plaintiff contends, however, that in *Servco*, the goods involved were recognized articles, commonly and commercially known as drill collars, whereas in the present case the articles are not commercially or commonly known by any *eo nomine* designation other than angles, shapes or sections. The difficulty with this argument is that the record in the present case shows that the imported articles are known not as angles, shapes or sections, but rather as side rails or top rails.

Also relevant is *Braun-Steeple Co.* v. *United States*, 18 CCPA 437, T.D. 44683 (1931), which involved sheets of steel 6 feet in length and 3 feet in width, in which perforations had been stamped, forming various fancy designs. After importation, the merchandise was cut to shape and form for use in radiator covers, panels in the ends of metal beds, lanterns, lighting fixtures, fire screens, etc. The court held that the importations were not mere sheets or stamped shapes under paragraph 304 of the Tariff Act of 1922—which paragraph, the court said, was "intended to provide for materials for further manufacturing processes and not for completely manufactured products." *Id.* at 440. Instead, the court held that since the involved articles had been so far processed as to be dedicated to particular uses, they were dutiable under paragraph 399 as partly-manufactured articles. Here, too, the imported merchandise had been so advanced and dedicated toward its ultimate use that it no longer consisted merely of a material for subsequent manufacturing processes but as an unfinished part of a railroad car. See e.g., *Burn Strauss, Inc.* v. *United States*, 62 Cust. Ct. 664, C.D. 3845, 305 F. Supp. 14 (1969).

## IV

This brings us to plaintiff's further argument that to hold that the imported rails are "parts of articles" would render the provision for steel angles, shapes and sections wholly or substantially nugatory. In this connection, plaintiff adds that if headnote 1(iv) were applied to the imported rails "there would be little, if any, room for the application of the tariff on angles, shapes and sections, since they are practically all dedicated as parts of particular articles." (Br. p. 20) Under

these circumstances, plaintiff asserts that "a holding that the term 'parts of articles' in the exclusionary headnote means 'products' but does not include basic materials, would resolve the possible conflict between 609.80 and the 'parts' provision." (Br. p. 19) In my view, the argument is without merit.

It may well be that most angles, shapes and sections are *ultimately* dedicated and used as parts of articles and that such *ultimate* use determines the form in which the angles, shapes and sections are made. See *United States* v. *The Singer Manufacturing Company*, 37 CCPA 104, 106, 107, C.A.D. 427 (1950). But this scarcely means that all angles, shapes and sections are parts *per se*. Thus, if in its imported condition, an angle, shape or section has been processed or advanced in manufacture *only* to a point where substantial additional processing is necessary before it can be used as a part of a given article, the import would not be classifiable as a "part," but rather would be considered a material and thus (if meeting the other statutory requirements) classifiable under a provision for angles, shapes and sections. See e.g., *United States* v. *The Singer Manufacturing Company, supra*, 37 CCPA 104; *Associated Metals & Minerals Corp.* v. *United States, supra*, 65 Cust. Ct. 586.

In point on this aspect is *Pistorino & Company, Inc.* v. *United States*, 69 Cust. Ct. 48, C.D. 4373, 350 F. Supp. 1392 (1972), appeal dismissed (1973). In that case, certain imported metal stampings or blanks which were used to manufacture latch needles by numerous other steps and by the addition of a latch were held to be properly dutiable as angles, shapes and sections under item 609.88 [6] rather than as unfinished latch needles under item 670.58.[7] Particularly pertinent is the following statement by the court (69 Cust. Ct. at 53–54) :

> * * * According to the Tariff Classification Study, Schedule 6, page 89, subpart B sets forth an orderly systematic arrangement which would apply to iron and steel, their alloys, and their basic shapes and forms in addition to iron and steel waste and scrap. It therefore logically follows that the provision for angles, shapes and sections includes a more advanced product than item 609.13,[8] * * * *but is still a material. Burn Strauss, Inc.* v. *United States*, 62 Cust. Ct. 664, C.D. 3845, 305 F. Supp. 14 (1969). It is to be noted that the superior heading to item 609.88 includes the language "whether or not drilled, punched, or otherwise advanced." This is a clear indication that an advancement even to the point of

---

[6] Item 609.88 covers cold formed angles, shapes and sections other than alloy iron or steel and weighing not over 0.29 pound per linear foot.

[7] The numerous steps required to process the imported blanks into latch needles were described in detail in *Pistorino & Company, Inc.* v. *United States*, 53 Cust. Ct. 174 at 176, C.D. 2491 (1964).

[8] Item 609.13 covers plates, sheets, and strip of iron or steel, other than alloy iron or steel, cut, pressed or stamped to nonrectangular shape and valued over 8 cents per pound.

dedication was intended to be included therein *so long as the article still remains material. Commercial Shearing & Stamping Company v. United States (Guadalupe Industrial Supply Company, Inc., Party in Interest)*, 65 Cust. Ct. 91, C.D. 4060, 317 F. Supp. 750 (1970) [aff'd. 59 CCPA 203, C.A.D. 1067, 464 F. 2d 1048 (1972)]. [Emphasis added.]

We have no difficulty in finding that the imported blanks are shapes which do not conform to the specifications set forth in headnote 3, schedule 6, part 2, subpart B. We further find that said blanks are dedicated to use as latch needle blanks but are not unfinished latch needles. *The record clearly establishes that nothing is done to the blanks after stamping and before shipping.* They are accordingly unadvanced shapes. *The record and exhibit 1 establish the numerous additional steps necessary to bring the blank to the point of being a latch needle.* [Emphasis added.]

To similar effect is a Bureau of Customs letter dated July 22, 1964 (T.D. 56377 (48)) which reads in part:

Shoe sections of steel, not alloyed, unfinished, delivered from a steel mill in sections of 20 to 30 feet, in a sort of tee form with one arm of the tee extended, *which, after importation, will be cut to size. drilled, and heat treated into replacement parts for crawler type tractors*, classifiable under the provision for Angles, shapes, and sections * * * hot rolled * * *: Not drilled, not punched, and not otherwise advanced: Other than alloy * * * steel, in *item 609.80*, TSUS. [Emphasis added.]

From the foregoing, it is apparent that contrary to plaintiff's contention, headnote 1(iv) in no wise renders nugatory the provisions for angles, shapes and sections so long as the article still remains a material.[9]

Moreover, even though many angles, shapes and sections may be advanced to the point where they are dedicated to use as parts, they still would be classifiable under the provisions for angles, shapes and sections if no specific provision for the part exists. For example, in *Commercial Shearing & Stamping Company v. United States, supra*, it was held that hemispherical shapes or heads—which were chiefly used as end closures on pressure containers designed and used for the transport and storage of compressed gases—were properly classified by the government as angles, shapes and sections under item 609.80— the same item that is involved here—rather than as articles of iron or

---

[9] Another Bureau of Customs letter dated June 29, 1964 (T.D. 56237 (145)) reads: Automobile tire rim bases made of hot rolled steel are classifiable under the provision for Sections * * * of iron or steel, hot rolled * * * not drilled, punched. or otherwise advanced * * *: * * * Other than alloy iron or steel, in item 609.80, TSUS. It is not possible to ascertain from this Bureau letter whether the article in question in its imported condition did or did not require substantial further processing. Hence, since the facts set forth in the letter are insufficient to determine whether the article is a part or material, the letter sheds no light on the problem before us here.

steel, not specially provided for, under item 657.20, as claimed by plaintiff. While the record showed that the imported merchandise was a part of a metal pressure container designed and used for the transport and storage of compressed gases, item 640.10, which covers such containers, does not provide for parts.[10] For that reason, classification of the imported shapes as a part under item 640.10 was precluded and the articles were held properly classified as angles, shapes and sections under item 609.80—which item, the court held, was relatively more specific for the hemispherical shapes, in the condition imported, than item 657.20, the general provision for articles of iron or steel, not specially provided for.

## V

Finally, plaintiff contends that it is clear from the legislative history that the Tariff Commission understood that angles, shapes and sections, as well as structural steel shapes are always parts of something, and that therefore the provisions for angles, shapes and sections and structural steel shapes would be rendered nugatory if they were to be classified as "parts." However, when, as here, the language of a statute, i.e., headnote 1(iv), is clear and unambiguous, resort may not be had to legislative history. See e.g., *George B. Zaloom* v. *United States*, 21 CCPA 518, 521–2, T.D. 46972 (1934); *F. Mastronardi, Inc.* v. *United States*, 27 CCPA 350, 353, C.A.D. 110 (1940); *Marcel Schurman* v. *United States*, 38 Cust. Ct. 56, 58, C.D. 1843 (1957).

In any event, examination of the legislative history fails to support plaintiff's argument. As originally proposed by the Tariff Commission, schedule 6, part 2, headnote 1, provided that

> * * * This part does not include—
>
> \*     \*     \*     \*     \*     \*     \*
>
> (iv) other articles provided for elsewhere in the tariff schedules, or parts of articles.

See Tariff Classification Study, Explanatory and Background Materials, Schedule 6 (Nov. 15, 1960) p. 343 (hereafter referred to as the "Tariff Classification Study").

Also, in its original form, items 609.80 and 609.92 of schedule 6, part 2, subpart B, read in part as follows: (*Id.*, p. 371):

> Angles, shapes, and sections, all the foregoing, of iron or steel, hot rolled, forged, extruded, drawn, cold formed or cold finished, whether or not drilled, punched, or otherwise advanced, *or made by the as-*

---

[10] Item 640.10 covers "Metal pressure containers designed and used for the transport and storage of compressed gases : * * * Other."

*sembly of components;* sheet piling of iron or steel: [Emphasis added.]

Angles, shapes, and sections:

Not drilled, not punched, not otherwise advanced, *and not made by the assembly of components:* [Emphasis added.]

Hot rolled:

609.80          Other than alloy iron or steel_____    \* \* \*

\*    \*    \*    \*    \*    \*    \*

Drilled, punched, otherwise advanced, *or made by the assembly of components:* [Emphasis added.]

609.92          Other than alloy iron or steel _____    \* \* \*

In addition, as originally proposed, item 652.98 of schedule 6, part 3, subpart F read as follows (Tariff Classification Study, p. 437):

Hangers and other buildings, bridges, bridge sections, lock-gates, towers, lattice masts, roofs, roofing frameworks, door and window frames, shutters, balustrades, pillars and columns, and other structures and parts of structures, all the foregoing of base metal:

Of iron or steel:

\*    \*    \*    \*    \*    \*    \*

652.98      Other _____    \* \* \*

In the course of hearings before the Tariff Commission with respect to these proposed provisions, Peter N. Schiller, representing the American Institute for Imported Steel, Inc., testified as follows (Tariff Classification Study, p. 584):

Finally, the attention of the institute was called by a number of persons to what they thought might be a possible conflict between item 652.98 \* \* \* and the provisions of part 2, particularly those dealing with angles, shapes, and sections, items 609.80 et seq. \* \* \*. The main caption above item 652.98 \* \* \* deals with complete steel structures and parts thereof, such as hangars, bridges, towers, and the like. After enumerating "hangars and other buildings, bridges, bridge sections, block-gates," etc., the caption says: "and other structures and parts of structures." It has been suggested that the inclusion of the phrase "parts of structures" in this provision might conflict with or overlap the clear provisions for steel shapes in part 2 \* \* \* items 609.80 et seq. That it is not intended that there be any overlapping seems to us quite clear. If, for example, punched angles or other shapes were to be classified as "parts of structures" under item 652.98 in part

3, instead of under item 609.92 in part 2, then all angles, shapes, and sections might equally well be so treated since all angles, shapes, and sections are pieces of structural steel used to make structures. Such an interpretation, which would eliminate almost any application of items 609.80 to 609.98 would be, of course, absurd. Nevertheless, to avoid any possible confusion, we have suggested that there be added at the end of the caption preceding item 652.98, after the phrase "parts of structures," the words "not provided for in part 2B of this schedule."

Also, in connection with these proposed provisions, Malcolm S. Langford, representing a foreign manufacturer and exporter of fabricated structural steel shapes, testified in part as follows (*Id.*, p. 608) :

I fully agree with Mr. Schiller that every fabricated structural steel shape is for use in some kind of structure and that, accordingly, if such shapes should be considered "parts of structures" under item 652.98, there would be no reason to include item 609.92 in the schedule at all.

It seems reasonably clear that the intention of the drafters of the proposed revised tariff schedules was to cover all fabricated structural steel shapes in item 609.92 and not by the general words "parts of structures" in the caption preceding item 652.98.

Paragraph 9 of the general headnotes and rules of interpretation of the proposed schedules says, in subparagraph (c), that an article described in more than one provision of the schedules is to be classified in the provision which most specifically describes it— in this case, item 609.92.

Secondly, subparagraph (g) of paragraph 9 says that a provision for "parts" of an article covers a "product" solely or chiefly used as a part of such article, though it does not prevail over a specific provision for such a part. Thus, "parts of structures" must mean "metal products," which is the subject of part 3 of schedule 6. Since angles, shapes, and sections are not "products," but basic shapes and forms under part 2 of schedule 6, fabricated structural steel shapes are by definition excluded from item 652.98.

Furthermore, the caption preceding item 652.98 enumerates such articles as door and window frames, shutters, balustrades, pillars, and columns which are themselves, plainly, distinct products even though intended for use as parts of structures.

This is consistent with the common practice of speaking of automobile parts as covering, for example, carburetors, axles, and brake drums, but not pieces of metal or other materials which go into such parts.

Finally, it seems doubtful that the drafters of schedule 6 intended in this way to effect a tariff increase from 7½ to 19 percent ad valorem, or even that it lies within the authority granted by section 101 (d) of the Customs Simplification Act to do so.

\*        \*        \*        \*        \*        \*        \*

Notwithstanding the fact that fabricated structural steel shapes would probably be found to come under item 609.92 rather than

item 652.98, if the issue were litigated, and notwithstanding the evidence that item 609. 92 was intended to cover such shapes, we join in the suggestion that any possible doubt be removed by appropriate amendment. Clarification could be accomplished in any one of several ways, including the amendment suggested in Mr. Schiller's statement. As a possible alternative, we suggest that the words "other structures and parts of structures" in item 652.98 be changed to read "other structures and products (but not basic shapes and forms) used as parts of structures."

Thereafter, the following colloquy took place between Russell N. Shewmaker, Assistant General Counsel of the Tariff Commission, and the witness Langford (*Id.*, p. 608) :

MR. SHEWMAKER. I believe your point is well taken and some clarification is in order and we will give further attention to that.

I would like to ask you a question, though, about the nature of your imports. Are your imports invariably the individual pieces or do you have any sub-assemblies which, as imported, are in assembled condition?

MR. LANGFORD. * * * They are always individual pieces, Mr. Shewmaker.

MR. SHEWMAKER. Would there ever be any instance where the complete structure would be imported in knocked-down condition?

MR. LANGFORD. The answer would be "No, there would never be a complete structure in one shipment; they would always be knocked down," and, for example, if there were a powerline being built by somebody like the New York State Power Authority, which is a customer of SAE, the shipments would necessarily be all of the pieces of steel which go into the footings and the legs first for all of the towers in the line and then you would start to get pieces which go higher up on the line of towers.

MR. SHEWMAKER. So you have no assemblies of pieces and no complete towers in a single shipment?

MR. LANGFORD. That is right.

In the final draft, the language preceding items 609.80 and 609.92 was changed (1) by deleting the phrase (which has previously been quoted in italics) "or made by the assembly of components," and (2) by deleting from the language immediately preceding item 609.80 the phrase (which also has previously been quoted in italics) "and not made by the assembly of components." Further, the format of items 609.80 through 609.98 was revised. As the Tariff Commission explained (Tariff Classification Study, pp. 94–95) :

Items 609.80 through 609.98 cover angles, shapes and sections, and sheet piling, of iron or steel. The proposed provisions are derived from paragraphs 304, 305, and principally 312. The provisions of these items have been modified substantially since the public hearing to take care of valid objections which were raised

in connection with the hearing. The published provisions were unclear in certain respects and also would have increased the rates of duty on significant items of trade. The objections raised by importers on these points have been taken care of in the final proposals. In these items and also in related provisions of part 3F of this schedule (items 652.90 through 652.98) existing customs practices are reflected without significant rate change. * * *

Plaintiff insists that "[f]rom the above, it is clear that the Tariff Commission understood that structural steel shapes as well as angles, shapes and sections are always parts of something, and there would be no room for the operation of the provisions for structural steel shapes and angles, shapes and sections if they were to be classified as 'parts.'" (Br. p. 19) On the contrary, as the witness Schiller testified, it would be "absurd" to interpret the phrase "parts of structures" in item 652.98 as covering all angles, shapes and sections. Tariff Classification Study, p. 584. Nevertheless, to avoid any possible confusion, he suggested that there be added at the end of the caption preceding item 652.98, after the phrase "parts of structures" the words "not provided for in part 2B of this schedule." *Ibid.* The testimony of the witness Langford (as noted previously) was to similar effect, except that he suggested as a possible alternative that the words "other structures and parts of structures" in item 652.98 be changed to read "other structures and products (but not basic shapes and forms) used as parts of structures." Id., p. 608.

In this setting, it is to be observed (as pointed out before) that the Tariff Commission did not adopt the proposed changes in language recommended by the above witnesses but instead deleted from the language preceding items 609.80 and 609.92 the phrase "or made by the assembly of components" and also deleted from the language immediately preceding item 609.80 the phrase "and not made by the assembly of components."

In this connection, without deciding the question, it would appear that an angle, shape and section which is made by the assembly of components is ordinarily so far advanced in manufacture as to constitute a part rather than a material. In this circumstance, it would seem that the reason the Tariff Commission deleted such angles, shapes and sections from the provisions of items 609.80 et seq. was to avoid possible conflict between these provisions and the provision in item 652.98 covering "parts of structures." Be that as it may, what is even more significant in all this is that the Tariff Commission and Congress did not exclude item 609.80 *in any way* from the operative effects of headnote 1(iv). In fact, the only change made in that headnote, as originally proposed, was to add the word "specially" after the word "articles."

## VI

In summary, the court holds that the imported rails are "parts" of railroad cars of the kind described in item 690.15 and were, therefore, by virtue of headnote 1(iv), properly classified by the government under item 690.35. Plaintiff's claim for classification under item 609.80 is therefore overruled.

Judgment will be entered accordingly.